**ODL SERVICES, INC., Appellant**

v.

**CONOCOPHILLIPS COMPANY,
Appellee.**

**In re ODL Services, Inc., Relator.**

**Nos. 01–08–00020–CV, 01–08–00039–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 14, 2008.

Ben L. Aderholt, Looper, Reed & McGraw, Houston, TX, for Appellant.

Jeffrey Parsons, Darin L. Brooks, Beirne, Maynard & Parsons, LLP, Houston, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and BLAND.

## OPINION

TIM TAFT, Justice.

By interlocutory appeal and petition for writ of mandamus, appellant and relator, ODL Services, Inc. ("ODL"), challenges the trial court's order denying its motion to compel arbitration and granting the application to stay arbitration of appellee and real party in interest, ConocoPhillips Company ("Conoco"). We determine (1) whether the Federal Arbitration Act[1] ("FAA") applies and whether review is proper by mandamus or interlocutory appeal, given that the motion invoked the FAA and the application invoked the Texas General Arbitration Act[2] ("TAA"); (2) whether the threshold issue of the existence of a written arbitration agreement between ODL and Conoco was for the trial court or for the arbitrator to determine; (3) whether the trial court erred in determining that there was no written agreement to arbitrate and, thus, in refusing to compel arbitration and in staying the arbitration proceeding that ODL had begun; and (4) whether the trial court abused its discretion in entering certain findings of fact. In the interlocutory appeal, we affirm that portion of the order that granted Conoco's application to stay arbitration that was made under the TAA. In the mandamus proceeding, we deny the petition for writ of mandamus (1) complaining of that portion of the interlocutory order that denied ODL's motion to compel arbitration that was asserted under the FAA and (2) complaining of the entry of certain findings of fact.

## Background

The disputed issues in this case arise out of (1) a master agreement between the predecessors of ODL and Conoco and (2) events occurring during the installation of a floating storage and off-loading vessel in the Gulf of Paria, Venezuela ("the FSO project").

## A. The Master Agreement Between Conoco and ODL

In March 1998, Conoco, Inc., the predecessor of Conoco, and Noble Denton & Associates, Inc., the predecessor of ODL, executed a "Master Agreement." The Master Agreement provided in pertinent part:

> WHEREAS, [Conoco] and its affiliated and subsidiary companies are engaged in drilling and production operations in various countries around the world; and

---

1. *See* 9 U.S.C.A. §§ 1–16 (West 2000 & Supp. 2007).

2. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001–.098 (Vernon 2005).

WHEREAS, from time to time, [Conoco's] affiliated and subsidiary companies may request certain support services in connection with their drilling and production operations in one or more such countries (other than the United States); and

WHEREAS [Conoco] wishes to enter into a Master contract with [ODL] setting forth the general terms and conditions to apply *should [Conoco] request [ODL] to provide such services to any of its subsidiary or affiliated companies;* and

WHEREAS, [ODL] is in the business of providing such services. . . .

## 1. *THE MASTER CONTRACT*

[Conoco] and [ODL] agree that, commencing with the effective date of this Agreement, the general terms and conditions entitled "Master Support Services Contract Terms and Conditions" and attached to this Agreement (hereinafter "Master Terms") shall apply to *all services* which [ODL] . . . provide[s] *for [Conoco] or any of its parent, subsidiary and affiliated companies . . ., pursuant to a "Request for Services" issued and accepted as set forth in Section 1.1 of the Master Terms.*

. . . .

## 6. *MISCELLANEOUS*

. . . This Master Contract is the entire agreement between the Parties as to the Services. . . . This Master Contract may only be amended by a clear statement in writing signed by a duly authorized representative of each of the Parties.

(Emphasis added.)

The "Master Support Services Contract Terms and Conditions" that were expressly incorporated into the Master Agreement provided, in turn, as follows:

The following Master Support Services Contract Terms and Conditions (hereinafter "Master Terms and Conditions") shall apply *upon [Conoco's] issuance and [ODL's] acceptance of a Request for Services* as set forth below. *The term "Contract" as used below shall mean a Request for Services and the Master Terms and Conditions.*

ARTICLE 1. *THE SERVICES*

1.1 *The Services.* When [Conoco] desires [ODL] to perform technical and support services for it, *[Conoco] shall send [ODL] a Request for Services in the form set forth in Exhibit "1."* The Request for Services shall name the contracting entity, describe in detail the services to be performed (hereinafter referred to as "the Services") and shall specify the country in which the Services are to be performed (hereinafter referred to as "Country of Operation"). If [ODL] is willing to perform the Services under the terms set forth in the Request for Services, duly authorized representatives of [ODL] and [Conoco] shall sign the Request for Services and return it to [Conoco]. [ODL] shall perform the Services in accordance with the Request for Services and the terms of this Contract. In the event of any conflict between the Request for Services and these Terms and Conditions, the terms of the Request for Services shall prevail.

[ODL] shall arrange for its personnel, material and equipment as defined in the Request for Services to be available and ready for the commencement of Work at the designated location in the Country of Operations specified in the Request for Services.

. . .

(Emphasis added.) The "Master Support Services Contract Terms and Conditions" repeatedly referred to various terms of the Request for Services ("RFS") that was

required for each job. Finally, the "Master Support Services Contract Terms and Conditions" included the following article concerning choice of law and arbitration:

ARTICLE 17. *GOVERNING LAW AND ARBITRATION*

17.1 *Governing Law. This Contract, and any matter arising out of or in connection with this Contract or the Services, shall be governed by and construed in accordance with the laws of the State of New York, U.S.A., except* for any law, rule or court opinion that would apply the laws of another jurisdiction.

17.2 *Arbitration. Any* dispute, controversy or claim *arising out of or in connection with this Contract,* or the breach, termination or *validity* thereof, shall be settled by final and binding arbitration to be conducted in accordance with the following provisions:

17.2.1 The arbitration shall be conducted in accordance with the International Arbitration Rules of the American Arbitration Association.....

(Emphasis added.) It was upon article 17 that ODL based its request for arbitration with Conoco.

In general, since the 1998 Master Agreement was executed, ODL worked for Conoco about six or seven times. In ODL's experience working under the Master Agreement with Conoco, the timing of Conoco's sending an RFS would vary from "project to project": sometimes, ODL would begin work, and Conoco would later send the RFS.

**B. The Events Leading to the Parties' Dispute**

In 2006, ODL, a Texas corporation, signed a "Services Agreement" with Conar Construcciones C.A. ("Conar"), a Venezuelan corporation, to provide engineering services as Conar's subcontractor on the FSO project. Some of ODL's services for Conar occurred in Venezuelan waters, and some occurred in Houston, Texas. Conar, in turn, had a contract with Conoco Venezuela C.A. ("CVCA") that covered work on the FSO Project. CVCA was an affiliate of, and a separate company from, Conoco.

Problems arose with Conar's work on the FSO project, and ODL was having difficulty getting Conar to pay ODL. On December 7, 2006, CVCA's Installation and Technical Services Manager, Alister McIntosh, advised Conar in writing that Conar had defaulted under the parties' contract.

On December 14, 2006, a monthly conference call was held at ODL's offices in Texas concerning the FSO project. At least one of the attendees was in Venezuela at the time. Those attending were Saaid Zaltash, Chris Haffner, Robert Sokoll, Weida Chen, Alister McIntosh, Mark Bacon, Larry Belcher, Magda Canas, Claudia Andrade, Max Grobe, Guy Noble, Tom Visentin, Reidar Eliassen, Karol Horne, and Roque Muracciole.

The parties disputed both what was decided at the December 14 meeting and which attendees represented which corporate entities. For example, the minutes from the December 14 meeting—to which no attendees objected—indicated that "CoP" (which Horne's testimony indicated was Conoco) would pay subcontractors directly and would make all further decisions. However, Sokoll recalled that it was CVCA, not Conoco, that would step into the payment and supervisory role mentioned by the minutes. Likewise, the parties disputed whether certain individuals at the December 14 meeting represented Conoco or, instead, CVCA. For example, the record indicates that Haffner, Chen, and Sokoll were Conoco employees being paid by Conoco. Yet there was also

testimony that these three individuals were working under a "technical work agreement" with CVCA at the time of the meeting, under which they were "technically working for CVCA and CVCA was reimbursing" their time "back to Conoco" for what Conoco paid them, and that Sokoll also reported to CVCA employees.[3]

The parties' dispute on these matters continued into the hearing on the application to stay and the motion to compel arbitration, with each party eliciting evidence in support of its position on (1) whether Conoco entered into a contract with ODL at the December 14 meeting and, if so, (2) whether that contract incorporated or invoked the Master Agreement and its arbitration clause.[4] What was undisputed is that a written RFS in the form required by the Master Agreement was never executed for the FSO project. It was further undisputed that no one at the December 14 conference-call meeting referenced the Master Agreement or indicated that its terms were incorporated by reference, amended the terms of the Master Agreement, or entered into a separate arbitration agreement covering the contract that was allegedly reached on December 14. Neither do the written minutes of the December 14 meeting mention arbitration or the Master Agreement.

ODL's corporate representative, David Rowan, testified that after the December 14, 2006 conference-call meeting, the scope of ODL's work on the FSO project continued under the terms of its Services Agreement with Conar. However, Rowan also testified that ODL followed certain procedures required by the Master Agreement, including keeping daily logs, monthly reports, and completion documentation, although he explained that doing these things was "also under [ODL's] agreement with Conar."

## C. The Procedural Background

On October 29, 2007, ODL made an arbitration demand on Conoco based on the arbitration provision of the Master Agreement. ODL sought $6,839,443.90 for goods and services that it had furnished

---

**3.** Additionally, (1) the minutes from the December 14 meeting do not distinguish among CVCA and Conoco employees, merely listing all of these individuals as being with "ConocoPhillips"; (2) ODL's corporate representative testified that Bacon, Canas, Zaltash, Andrade, and McIntosh were "ConocoPhillips representatives" at the meeting, when other evidence indicated that they were not; (3) Horne's testimony (and e-mail correspondence among others) implies that the name "ConocoPhillips" was sometimes used regardless of which Conoco-related entity was meant; (4) the December 14 minutes list Bacon as being with "ConocoPhillips," despite deposition testimony that he was not; and (5) Sokoll testified that no one at the December 14 meeting represented Conoco and that he, Haffner, and Chen "basically represented ... CVCA" at the December 14 meeting.

**4.** For example, (1) Horne recalled that it was said at the December 14 meeting that "ConocoPhillips" would take on the payment and decision-making responsibilities for the FSO project and (2) ODL tried sending two invoices to Conoco, only to be told to resubmit them to Conar. In contrast, there was also evidence that (1) on February 1, 2007, ODL's president wrote a CVCA employee asking "COP" if it could "assist with a resolution" to Conar's failure to pay ODL and acknowledging that ODL had "no direct contract with COP" and that ODL's "contract remains with Conar"; (2) a CVCA manager informed ODL on February 5, 2007 that CVCA, "under contractual provisions contained in our agreement with Conar," was "exercis[ing] the right to pay directly subcontractors including [ODL]"; (3) CVCA paid ODL's over-$3 million invoice; (4) although ODL sent two invoices to "ConocoPhillips" in January 2007, it sent them to a Venezuelan address that appears to be the same one used by CVCA's manager when writing to ODL in February 2007; and (5) from early 2007 forward, ODL invoiced Conar.

and performed on the FSO project since December 14, 2006. ODL filed a notice of arbitration with the International Centre for Dispute Resolution of the American Arbitration Association ("AAA"), describing its claims against Conoco as "breach of contract and quasi-contract."

On November 26, 2007, Conoco filed a petition for declaratory and injunctive relief. In that suit, Conoco sought (1) declarations of "its rights regarding the claim sought by ODL ... in the pending arbitration proceeding and the application of the [Master Agreement] to ODL['s] ... claim"; (2) a temporary and permanent injunction to prevent ODL from proceeding with arbitration and from "invoking the [Master Agreement] and the arbitration provision therein against [Conoco] for recovery of services on the FSO [Project] provided by ODL ..."; and (3) attorney's fees. Within the same pleading, Conoco also included an application to stay arbitration that invoked the TAA. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.023 (Vernon 2005).

Shortly thereafter, ODL filed a motion to compel arbitration that invoked the FAA, along with an answer conditional upon the motion's disposition. The motion and memorandum of law in support urged (1) that the FAA applied; (2) that, in the Master Agreement, the parties had agreed that threshold matters of arbitrability, including whether an arbitration clause existed (and whether Conoco had waived the RFS requirement of the Master Agreement), were to be decided by the arbitrator, not the trial court; and (apparently alternatively) (3) that the Master Agreement covered all international work that ODL did for Conoco, even when no formal RFS had been executed, and, in any event, Conoco had waived the Master Agreement's requirement of a formal RFS by accepting ODL's services without issuing

an RFS. ODL also described the threshold issue as follows:

> Conoco argues that no arbitration agreement exists between the parties because the Master Agreement *does not exist* without an RFS. To the contrary, whether Conoco waived the issuance of an RFS, raises the question of the Master Agreement's *applicability,* not its *existence* .... Conoco is attempting to transform the issues regarding the Arbitration Clause's "applicability" into one of its legal "existence" to avoid the case law which requires the arbitrator to determine arbitrability, and not this Court.

(Emphasis in original.)

In response to ODL's motion to compel arbitration, and in support of its application to stay arbitration, Conoco argued (1) that the existence of an arbitration agreement was for the court to determine, not the arbitrator; (2) that the alleged December 14 agreement could not support compelling arbitration because it was oral, not written; (3) that in any event, the participants at the December 14 meeting did not discuss the Master Agreement or incorporate its terms by reference, so that they did not agree at that meeting to arbitrate anything; and (4) that an RFS was a "condition precedent to a future contract for services that would incorporate the [Master Agreement's] written terms, including the arbitration provision."

On December 21, 2007, the trial court entered an interlocutory order reciting that, after having considered the parties' motion and application, the trial court was "of the opinion that no valid and enforceable agreement to arbitrate exists governing the claims which are the subject of arbitration." The trial court thus granted Conoco's application to stay arbitration and denied ODL's motion to compel arbitration.

The trial court simultaneously entered the following findings of fact and conclusions of law:

**Findings of Fact:**

1. ODL entered into a contract with [Conar] to provide services for a floating storage and offloading vessel in Venezuela.

2. ODL knew that Conar had a contract with [CVCA] to provide services and that ODL was a subcontractor to Conar on that project.

3. CVCA and [Conoco] are separate legal entities. CVCA is a subsidiary or affiliate of [Conoco].

4. ODL sent invoices to Conar and Conar has not paid all of the invoices.

5. ODL's predecessor and [Conoco's] predecessor entered into a Master Agreement in 1998. That agreement contains a written agreement to arbitrate.

6. The Master Agreement provides that the agreement applies to all services provided pursuant to a[RFS].

7. The Master Agreement covers a subsidiary or affiliate of [Conoco] if identified in the [RFS].

8. In the event of a conflict between the Master Agreement and the [RFS], the terms of the [RFS] shall prevail.

9. The agreement provides a written format for the [RFS] that outlines the details of the services to be performed and the parties to the request.

10. No written [RFS] was entered into between ODL and [Conoco].

11. No written [RFS] was entered into between ODL and CVCA.

12. Because of a default by Conar, on December 14, 2006 CVCA orally agreed to begin paying Conar's subcontractors directly, subject to paperwork.

13. CVCA did make some payments to Conar directly.

14. ODL acknowledged that it had no direct contract with [Conoco] on February 1, 2007.

15. ODL's services benefitted CVCA.

16. On December 14, 2006, [Conoco] did not orally agree to begin paying Conar's subcontractors directly.

17. No oral contract incorporating the Master Agreement was entered into between ODL and [Conoco].

18. ODL did not operate under the Master Agreement after December 14, 2006. All of its work was done under the terms of the Conar/ODL agreement.

19. [Conoco] did not waive its right to have a signed [RFS] between the parties.

**Conclusions of Law:**

1. There is no signed written agreement between ODL and [Conoco] for arbitration of the claim by ODL that [Conoco] orally agreed to pay Conar's subcontractors directly after Dec. 14, 2006.

2. ODL is not entitled to arbitrate this dispute.

3. [Conoco] is entitled to a stay of arbitration.

The trial court did not enter a conclusion of law as to whether the FAA or the TAA applied or under which of these statutes its two rulings were made.

ODL filed a request for amended findings of fact and conclusions of law, which objected to certain findings and conclusions on various bases, including that the trial court did not conclude which arbitration law applied, the trial court adjudicated the merits of ODL's claims that were pending before the AAA, some of the findings were incomplete, some findings conflicted with each other, and some findings

were unsupported by the evidence or were vague. The trial court then entered a supplemental conclusion of law that "[t]he findings made by the court in connection with the arbitration motion are not binding on the parties except in connection with the arbitration motion and are not rulings on the merits of the case."

### Whether the FAA Applies

ODL contends, as it did below, that the FAA applies. The trial court did not enter a conclusion of law as to whether the FAA or the TAA applied.

 "The FAA 'extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach.'" *In re Nexion Health at Humble,* 173 S.W.3d 67, 69 (Tex. 2005) (quoting *In re L & L Kempwood Assocs., L.P.,* 9 S.W.3d 125, 127 (Tex. 1999)). In this context, the term "commerce" is broadly construed. *Id.* Here, ODL contends that the alleged December 14 agreement between ODL and Conoco came into being by conference call among employees of corporations in different states and countries; additionally, that alleged agreement concerned which corporate entity (Conoco or CVCA) would pay ODL on behalf of Conar, a Venezuelan entity, for ODL's work for Conar under a services agreement between Conar and ODL in the Gulf of Paria, Venezuela. We this hold that the alleged December 14 agreement was a contract affecting international commerce, to which the FAA would apply. *See Palm Harbor Homes, Inc. v. McCoy,* 944 S.W.2d 716, 721 (Tex. App.-Fort Worth 1997, no pet.) ("It cannot be seriously argued that such a transaction, which is the product of national and even international commerce, does not affect interstate commerce.").

### Whether We Will Review the Rulings in the Trial Court's Order by Mandamus or Interlocutory Appeal

The fact that the alleged contract affected interstate commerce, and the application of the FAA, do not, in themselves, resolve whether an arbitration agreement may be enforced by the TAA or whether interlocutory appeal or mandamus is the proper means of reviewing a trial court's order denying arbitration in such a case.

 "The FAA 'preempts state statutes to the extent they are inconsistent with that Act.'" *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 780 (Tex.2006) (quoting *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992)). "The factors that determine whether the FAA preempts the TAA are whether (1) the agreement is in writing, (2) it involves interstate commerce, (3) it can withstand scrutiny under traditional contract defenses, and (4) state law affects the enforceability of the agreement." *In re Nexion Health at Humble,* 173 S.W.3d at 69. Accordingly, "[t]he mere fact that a contract affects interstate commerce, thus triggering the FAA, does not preclude enforcement [of an arbitration agreement in that contract] under the TAA as well." *In re D. Wilson Constr. Co.,* 196 S.W.3d at 780. Rather, "[f]or the FAA to preempt the TAA, state law must refuse to enforce an arbitration agreement that the FAA would enforce, either because (1) the TAA has expressly exempted the agreement from coverage ... or (2) the TAA has imposed an enforceability requirement not found in the FAA...." *Id.*

The parties dispute whether they entered into an agreement on December 14; if they did, whether that agreement was in writing; and if so, whether their agreement triggered application of the Master Agreement, which was the only agreement containing an arbitration clause between

ODL and Conoco. Putting aside the significance of these matters for the moment, we see no basis on which the TAA would exempt from coverage, or would impose different enforceability requirements on, any arbitration agreement that might exist. Accordingly, the FAA would not preempt the enforcement under the TAA of any arbitration agreement that might exist.

The trial court did not enter a conclusion of law concerning whether any arbitration agreement that might exist could be enforced by, or was enforced by, the FAA or the TAA in this case. Conoco moved to stay arbitration under the TAA, whereas ODL moved to compel arbitration under the FAA. The trial court granted the application to stay that was asserted under the TAA and denied the motion to compel that was asserted under the FAA. In *In re D. Wilson Construction Co.*, the relators-defendants moved to compel arbitration under both the TAA and the FAA, which requests the trial court denied. 196 S.W.3d at 778. The contracts involved interstate commerce, thus triggering the FAA, and referenced neither the TAA nor the FAA. *Id.* at 778–79. The supreme court held that "[t]he mere fact that a contract affects interstate commerce, thus triggering the FAA, does not preclude enforcement under the TAA as well," as long as the FAA does not preempt the TAA.

*Id.* at 780. Because the FAA did not preempt the TAA in that case, the supreme court held that the court of appeals had jurisdiction over *both* an interlocutory appeal taken under the TAA's provisions *and* a mandamus proceeding. *Id.* The supreme court then proceeded to consider the matter in the original proceeding, dismissing the related interlocutory appeal as moot after having granted full relief in the former proceeding. *Id.* at 783–84.

Here, unlike in *In re D. Wilson Construction Co.*, there are two separate motions on which the trial court ruled in a single order: each motion sought enforcement of the alleged arbitration agreement, or a stay of arbitration, under a different arbitration act. Conoco applied to stay arbitration only under the TAA. Interlocutory appeal lies over an order granting an application to stay arbitration when the application is asserted under the TAA. *See* Tex. Civ. Prac. & Rem.Code Ann. § 171.098(a)(1) (Vernon 2005) ("A party may appeal ... an order ... denying an application to compel arbitration made under Section 171.021 [of the TAA]."). When there is an adequate remedy by appeal, such as for this ruling, mandamus will generally not lie. *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). We thus review the trial court's ruling granting Conoco's motion to stay arbitration in the interlocutory appeal.[5]

---

**5.** The Master Agreement—the only contract between these parties containing an arbitration clause—called for the application of New York law. A contractual choice-of-law provision calling for the application of another jurisdiction's substantive law may render the TAA unavailable to enforce an arbitration provision within the same agreement. *See In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 551 (Tex.2002); *In re Citigroup Global Mkts., Inc.*, 202 S.W.3d 477, 481 (Tex.App.-Dallas 2006, orig. proceeding & ·no pet.) (combined mandamus and interlocutory appeal), *mandamus relief granted on other*

grounds, 258 S.W.3d 623 (Tex.2008). Assuming without deciding that this authority could also prevent a party from invoking the TAA's provisions providing for the stay of arbitration, we conclude that that line of authority does not control here: here, the parties dispute whether the Master Agreement—including its choice-of-law and arbitration clauses—was triggered in the first place. If the Master Agreement was not triggered, then its choice of New York law could not preclude an application for stay under the TAA pursuant to this line of authority.

In contrast, ODL invoked only the FAA to enforce the alleged arbitration agreement, although ODL could also have sought enforcement under the TAA. *See In re D. Wilson Constr. Co.*, 196 S.W.3d at 780. Appeal lies over "an order ... denying *an application* to compel arbitration *made under Section 171.021 [of the TAA]*." [6] Tex. Civ. Prac. & Rem.Code Ann. § 171.098(a)(1) (Vernon 2005) (emphasis added). Under the plain language of section 171.098(a)(1), if the application to compel arbitration is not "made under [TAA] Section 171.021," then no interlocutory appeal lies from a ruling denying that motion. ODL's motion was not made under TAA section 171.021. Accordingly, the trial court's order denying that motion could not have been one "denying an application to compel arbitration made under Section 171.021 [of the TAA]." *See id.* In this circumstance, we review the order denying ODL's motion to compel arbitration by mandamus.

### Whether the Trial Judge Abused Her Discretion in Denying ODL's Motion to Compel Arbitration (Mandamus)

In issue one of its petition for writ of mandamus, ODL contends that the trial judge erred in denying its motion to compel arbitration that invoked the FAA.

### A. What the Standard for Mandamus Relief Is

"Mandamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, ... as when a party is erroneously denied its contracted-for arbitration rights under the FAA." *In re D. Wilson Constr. Co.*, 196 S.W.3d at 780–81 (citations omitted). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, without reference to any guiding rules or principles." *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex.2002). Additionally, a trial court " 'has no "discretion" in determining what the law is or applying the law to the facts.' " *In re D. Wilson Constr. Co.*, 196 S.W.3d at 781 (citations omitted) (quoting *Walker*, 827 S.W.2d at 840).

### B. Who Decides Substantive Arbitrability

In its first argument under issue one, ODL asserts that the trial judge abused her discretion in determining that no valid arbitration agreement existed between the parties because the issue is one of substantive arbitrability and the Master Agreement requires that such issues be determined by the arbitrator.

#### 1. ODL's Arguments

In support of this portion of its issue, ODL argues:

15. ... ODL recognizes it is typically the role of the court to initially determine only the issue of arbitrability. However, based on the freedom of contract, courts, including this one, have recognized an exception which allows the parties the freedom to agree that the arbitrators have sole jurisdiction over the issue of arbitrability. This dispute should be referred to an arbitrator in its entirety.

. . . .

16. Under the [FAA] a court shall refer the question of arbitrability to the arbitrator where there is "clear and unmistakable" evidence that the parties intended to have the arbitrator decide this question. Many courts have found "clear and unmistakable" evidence in

---

6. TAA section 171.021 is entitled "Proceeding to Compel Arbitration." Tex. Civ. Prac. & Rem. Code Ann. § 171.021 (Vernon 2005).

two situations both of which are applicable here. First, the courts have recognized that "a 'broadly worded arbitration clause committing resolution of all disputes to arbitration' would satisfy the clear and unmistakable standard." Second, "most courts have held that, 'when ... parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Here, the arbitration clause includes **both** of these features.

. . . .

23. Conoco argues that no valid arbitration agreement exists between the parties because the [Master Agreement] *does not exist* without an RFS form. To the contrary, whether Conoco waived the use of its traditional RFS form, is grounded in contract principals and touches on the question of the [Master Agreement's] *applicability,* not its *existence.* In reading cases cited by Conoco, it becomes clear that in the context of arbitration agreements, "existence" refers to when a party alleges forgery, unauthorized signature, or some other reason why an agreement between the parties *never* existed. Here, the arbitration agreement clearly exists. The [Master Agreement] was fully executed by both companies. . . . Conoco instead is relying on a repackaged version of an arbitrability argument to attempt to establish its point. This strained effort to transform the issue of the Arbitration Clause's "applicability" into one of its legal "existence" is a transparent attempt to avoid the case law requiring the arbitrator to determine arbitrability rather than the court. . . .

24. ODL maintains that Conoco's argument with respect to "existence" is in effect an argument regarding arbitrability. However, ODL and Conoco have already agreed to refer all disputes with respect to the [Master Agreement] and Arbitration Clause's existence or validity to the arbitrator. As with arbitrability, the Arbitration Clause's broad language and incorporation of the AAA International Arbitration Rules clearly evidences the parties' intent to refer all disputes with respect to the *existence* to the arbitrator. . . .

25. In addition, the parties explicitly granted to the arbitrator the exclusive power to determine all disputes involving the "validity" of the agreement. . . .

**2. The Law**

 " '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).

 "In *Howsam* ..., the United States Supreme Court ... concluded that, unless an arbitration agreement provides otherwise, a court may determine only matters of substantive arbitrability. . . ." *W. Dow Hamm III Corp. v. Millennium Income Fund, L.L.C.,* 237 S.W.3d 745, 753 (Tex.App.-Houston [1st Dist.] 2007, orig. proceeding & no pet.) (combined mandamus and interlocutory appeal) (citing *Howsam* at 84, 123 S.Ct. at 592). "The question of [substantive] arbitrability has two aspects: first, whether the parties agreed to arbitration (or are bound by another's agreement to arbitrate ... ); and second, whether a particular claim or dispute is within the scope of the agreement." *P. McGregor Enters., Inc. v. Denman Bldg. Prods., Ltd.,* No. 07–05–0385–CV, —— S.W.3d ——, —— n. 9, 2007 WL

1201545, at *3 n. 9 (Tex.App.-Amarillo May 25, 2007, pet. denied); *see First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995) (describing arbitrability as whether the parties "agreed to arbitrate the merits" of their dispute); *In re Weekley Homes,* 180 S.W.3d 127, 130 (Tex.2005) (describing "gateway matters" as including "whether a valid arbitration agreement exists" and whether "an arbitration agreement is binding on a nonparty"). "In contrast, the [*Howsam*] Court also determined that the arbitrator, rather than the court, should determine matters of procedural arbitrability, *i.e.,* those matters that 'grow out of the dispute and bear on its final disposition.' " *W. Dow Hamm III Corp.,* 237 S.W.3d at 754 (quoting *Howsam,* at 84, 123 S.Ct. at 592).

 Parties may generally agree, however, to send even matters of substantive arbitrability to arbitration. *See Howsam* at 84–85, 123 S.Ct. at 592. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, ... so the question of 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options* at 943, 115 S.Ct. at 1923 (emphasis in original). If the parties did not agree to submit the substantive arbitrability question itself to arbitration, then "the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." *Id.* at 943, 115 S.Ct. at 1924. "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts," with the qualification that, "when courts decide whether a party has agreed that arbitrators should decide arbi-

trability," courts "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Burlington Res. Oil & Gas Co. v. San Juan Basin Royalty Trust,* 249 S.W.3d 34, 39 (Tex. App.-Houston [1st Dist.] 2007, pet. denied) (quoting *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924). In *First Options,* "[t]he Supreme Court noted that 'the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement" ' " so as to not 'force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.' " *Burlington Res. Oil & Gas Co.,* 249 S.W.3d at 39–40 (quoting *First Options,* 514 U.S. at 944–45, 115 S.Ct. at 1924–25).

### 3. Analysis

Here, the Master Agreement's arbitration clause provides:

> *Any* dispute, controversy or claim *arising out of or in connection with this Contract,* or the breach, termination or *validity* thereof, shall be settled by final and binding arbitration to be conducted in accordance with the following provisions: . . . .

(Emphasis added.) Such language is broad. *See, e.g., Hou–Scape, Inc. v. Lloyd,* 945 S.W.2d 202, 205–06 (Tex.App.-Houston [1st Dist.] 1997, orig. proceeding) ("The words used in these particular contracts, 'arising out of or relating to,' have been held to be very broad language favoring arbitration."). Additionally, the Master Agreement requires that arbitration be "conducted in accordance with the International Arbitration Rules of the American

Arbitration Association." These rules provide in relevant part:

> The tribunal shall have the power *to rule on its own jurisdiction*, including any objections with respect to the *existence*, scope or validity of the arbitration agreement.

*International Dispute Resolution Procedures*, http://www.adr.org/sp.asp?id= 33994# INTERNATIONAL%20ARBITRATION%20RULES (last visited Aug. 4, 2008) (emphasis added). It is on both the breadth of the arbitration provision's language, and on the fact that the provision incorporates article 15(a) of the pertinent AAA rules, that ODL relies to argue that the parties clearly and unmistakably agreed to submit substantive arbitrability matters—whether they be phrased as the agreement's existence or its applicability— to the arbitrator, rather than to the trial court.

▉ ODL's position reverses the proper inquiry. ODL starts by invoking the Master Agreement's arbitration clause, then asks if the Master Agreement was incorporated into the parties' alleged oral contract. Instead, the initial inquiry is whether the parties entered into any kind of agreement that could trigger the Master Agreement; only if the answer to this inquiry is "yes" do we then consider what the Master Agreement's arbitration clause provides. We reach this conclusion because of the Master Agreement's terms specifying how it would be triggered and because of ODL's arguments below.

The Master Agreement indicated that it was not self-effectuating, but instead required a request by Conoco for ODL's services. For example, the Master Agreement recited that the parties desired to establish, by entering into it, "the general terms and conditions to apply *should [Conoco] request [ODL] to provide ... services* to any of its subsidiary or affiliated companies," and it provides that the agreement applies "to all services which [ODL] ... provide[s] for [Conoco] or any of its parent, subsidiary and affiliated companies" pursuant to Conoco's request. (Emphasis added.) In sum, the Master Agreement did not apply in the abstract, but instead applied only if Conoco requested ODL's services. The Master Agreement (and its arbitration clause) was not a binding contract until the parties entered into some kind of future agreement for ODL's services. *See Moser v. Aminoil, USA, Inc.*, 618 F.Supp. 774, 779 (W.Dist.La.1985) ("The [master] agreement does not bind either party to perform any services. It merely sets forth their agreement to abide by certain terms should they enter into contractual relations in the future.... In short, no valid obligation arises until the platform operator ... requests the services of the subcontractor ... and, at that point, the terms of the master service agreement are incorporated automatically into the written or verbal contract to perform the specified services.") (citations omitted). Simply put, the Master Agreement was an agreement as to what terms would apply if the parties later contracted for ODL's services.

ODL's arguments to the trial court reflected an understanding that some kind of agreement between ODL and Conoco for the former's services was needed to trigger the Master Agreement and to make Conoco subject to its arbitration provision. For example, although the parties disputed whether the request for ODL's services that could trigger the Master Agreement could be made in ways other than by issuing and executing a formal RFS, they did not dispute that *some* kind of request by Conoco, and acceptance by ODL, was required to make the Master Agreement apply and for its arbitration clause to bind Conoco. ODL argued to the trial court

that the Master Agreement's clause providing that it applied to all services made pursuant to an RFS "does not exclude other agreements" or "any other request for services" from "being within the scope of the Master Agreement"; that "Conoco requested ODL's services on the [FSO Project]"; and that, alternatively, Conoco waived any requirement for an RFS by, at the December 14 meeting, "request[ing] [that] ODL's services ... be performed directly to Conoco on the [FSO Project]" based on "an existing scope of work." All of these arguments reflect an understanding that the Master Agreement could not apply absent some form of request for ODL's services by Conoco. Additionally, it is undisputed that no one at the December 14 meeting discussed arbitration or incorporated the Master Agreement by reference.

The proper focus is thus on whether Conoco requested, in some way, ODL's services at the December 14 meeting. If no underlying request for ODL's services existed to trigger the contractually separate arbitration agreement, or that itself contained its own arbitration agreement, then there is no issue of substantive arbitrability to send to an arbitrator. In these circumstances, it was for the trial court in the first instance to determine this threshold matter. *Cf. Will–Drill Res., Inc. v. Samson Res., Inc.*, 352 F.3d 211, 219 (5th Cir.2003) ("[W]here the very existence of an agreement is challenged, ordering arbitration could result in an arbitrator deciding that no agreement was ever formed. Such an outcome would be a statement that the arbitrator never had any authority to decide the issue. A presumption that a signed document represents an agreement could lead to this untenable result. We therefore conclude that where a party attacks the very existence of an agreement, as opposed to its continued validity or enforcement, the courts must first resolve

that dispute."). If the parties did not contract, then they could not have invoked the Master Agreement under either ODL's theory or Conoco's theory of how that agreement could be triggered. And if the Master Agreement was not triggered, then whether its arbitration provision required matters of substantive arbitrability to be arbitrated is irrelevant.

We overrule ODL's argument under issue one in the mandamus proceeding based on substantive arbitrability.

## C. Whether the Trial Judge Abused Her Discretion in Concluding that the Parties Did Not Enter into a Written Agreement to Arbitrate

Also under issue one, ODL alternatively argues that the trial judge abused her discretion in concluding that there was no signed, written agreement between ODL and Conoco for arbitration of the claim that Conoco orally agreed to pay Conar's subcontractors after December 14, 2006. In support, ODL argues (1) that Conoco and ODL agreed on December 14 for ODL to provide services to Conoco (and for Conoco to pay and to assume direction of the FSO Project) and that that agreement was memorialized in writing by e-mail; (2) that the Master Agreement applied whether or not a formal RFS was issued because, by its terms, the agreement applied to all international services that ODL provided to Conoco; and (3) that Conoco waived the requirement for execution of a formal RFS.

### 1. The Standard of Review

 "It is well established Texas law that an appellate court may not deal with disputed areas of fact in an original mandamus proceeding." *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex.1990). Likewise, "[i]n reviewing findings of fact in a mandamus proceeding,

we cannot substitute our judgment for that of the trial court." *In re Dillard Dep't Stores, Inc.,* 198 S.W.3d 778, 780 (Tex. 2006). "Instead, the relator 'must establish that the trial court could reasonably have reached only one decision,' and that its finding to the contrary is 'arbitrary and unreasonable.' " *Id.* (quoting *Walker,* 827 S.W.2d at 840). Under this standard, the relator must show that "the evidence compels a finding" that the factual assertion on which it bases its challenge is true. *Id.*

### 2. Analysis

The Master Agreement provided that the "Master Support Services Contract Terms and Conditions" attached to the Master Agreement would apply to all services that ODL provided for Conoco or any of its parent, subsidiary and affiliated companies (which, in the abstract, would include CVCA) "pursuant to a 'Request for Services' issued and accepted as set forth in Section 1.1 of the Master [Support Services Contract] Terms [and Conditions]." The Master Support Services Contract Terms and Conditions, in turn, required that "COMPANY" make the request for ODL's services. "COMPANY," with regard to an RFS, was defined for the Master Support Services Contract Terms and Conditions as "such parent or affiliated or subsidiary company of COMPANY [defined as Conoco] entering said [RFS]." Under this contractual language, if CVCA entered into an RFS with ODL, the Master Agreement would be incorporated into that contract, but then that contract (and its arbitration agreement) would be with CVCA, not Conoco, which the trial judge found was a separate legal entity from Conoco. Therefore, under the Master Agreement's terms, for Conoco to be subject to its arbitration provision, Conoco had to request ODL's services. ODL's arguments here and below reflect this understanding.

The trial judge found that CVCA (not Conoco) agreed on December 14, 2006 to begin paying Conar's subcontractors directly; that ODL's services benefitted CVCA; that Conoco did not agree to begin paying Conar's subcontractors directly at the December 14 meeting; and that ODL and Conoco did not enter into an oral agreement incorporating the Master Agreement. There was conflicting evidence as to whether the individuals at the December 14 meeting who were not employees of ODL or Conar were acting as CVCA or Conoco employees and whether they were representing CVCA or Conoco in making any agreement that was reached. There was also conflicting evidence as to which Conoco-related entity was billed for or paid ODL for its services and which Conoco-related entity informed ODL where its bills should be sent. The trial judge resolved this conflicting evidence in favor of Conoco, finding that ODL and Conoco did not enter into an agreement on December 14, 2006 that could invoke the Master Agreement. The evidence does not conclusively establish something other than what the trial judge found in this regard. *See In re Dillard Dep't Stores, Inc.,* 198 S.W.3d at 781; *see also Brady,* 795 S.W.2d at 714 (recognizing that appellate court may not deal with disputed areas of fact in mandamus proceeding). The trial judge thus did not abuse her discretion in finding that ODL and Conoco had no contract that could implicate the Master Agreement or its arbitration provision. Consequently, the trial judge did not abuse her discretion in concluding that no arbitration agreement existed between the parties or in denying ODL's motion to compel arbitration.

We overrule the remainder of issue one in the mandamus proceeding, which concerns the denial of ODL's motion to compel arbitration.

**Whether the Trial Court Erred in Granting Conoco's Application to Stay Arbitration (Interlocutory Appeal)**

In issue one in its interlocutory appeal, ODL raises the same challenges to the trial court's granting of Conoco's application to stay arbitration that invoked the TAA as it did in the mandamus proceeding to the trial court's denial of its motion to compel arbitration that invoked the FAA.

**A. What the Standard of Review Is**

ODL does not specify which findings of fact or conclusions of law it challenges. We have nonetheless reviewed the substance of all of its appellate arguments to determine which findings of fact and conclusions of law ODL has implicitly challenged for each appellate argument. *See City of Pasadena v. Gennedy,* 125 S.W.3d 687, 691 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (construing appellant's challenges, which did not specify to which findings of fact or conclusions of law they related, to attack pertinent findings and conclusions supporting complained-of aspects of judgment); *see also* TEX.R.APP. P. 38.1(e), 38.9; *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989) ("[I]t is our practice to construe liberally points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants.").

We review legal conclusions *de novo. Gennedy,* 125 S.W.3d at 691. Regarding fact findings, "[w]hen, as here, we have a complete reporter's record on appeal, we review the trial court's fact findings under the same standards for legal sufficiency as govern the review of jury findings." *Id.* As with challenges to jury findings, "when the complaining party challenges the legal sufficiency of the evidence underlying an adverse finding on which the party did not have the burden of proof, the party must demonstrate on appeal that there is no evidence to support the finding." [7] *Id.*

To determine whether there is some evidence to support a finding of fact, "we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex. 2003). If more than a scintilla of evidence supports the finding of fact, we must uphold it. *See id.* More than a scintilla of evidence exists if the evidence " 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.' " *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). Conversely, evidence that is " 'so weak as to do no more than create a mere surmise' " is no more than a scintilla and, thus, no evidence. *Id.* (quoting *Kindred v. Con/ Chem., Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable [fact finders] could, and dis-

---

7. Although we apply the no-evidence standard of review, we note that the result would be the same regardless of how the standard of review is phrased for this challenge. *See Canzeri Co. v. AON Servs. Gr., Inc.,* No. 05–99–01656–CV, 2000 WL 721713, at *2 (Tex.App.-Dallas June 6, 2000, no pet.) (not designated for publication) (applying the no-evidence standard of review in appeal of order granting application to stay arbitration under TAA, despite uncertainty concerning burden of proof under TAA section 171.023(a), because appeal's outcome would be same under no-evidence or as-a-matter-of-law standard of review).

regard contrary evidence unless reasonable [fact finders] could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *accord Chubb Lloyds Ins. Co. of Tex. v. H.C.B. Mech., Inc.*, 190 S.W.3d 89, 92 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

## B. How We Rule on ODL's Arguments

ODL raises the same arguments in its interlocutory appeal of the granting of Conoco's application to stay arbitration as it did in its mandamus proceeding challenging the denial of its motion to compel arbitration. In the mandamus proceeding, we have already explained why the relevant threshold matter of substantive arbitrability was for the court, rather than the arbitrator, to decide. Accordingly, we overrule the challenge under issue one contending that the arbitrator should decide matters of substantive arbitrability here. Likewise, we have also analyzed the evidence and concluded that the trial court did not clearly abuse its discretion in finding that ODL and Conoco had no agreement that would trigger the Master Agreement and subject Conoco to arbitration. Although the standard of review in this interlocutory appeal is no-evidence, rather than abuse of discretion, the result is the same: the evidence outlined above that the trial court had discretion to believe also is more than a scintilla of evidence supporting the relevant findings. Accordingly, we overrule issue one in ODL's interlocutory appeal.

## Whether the Trial Judge Abused Her Discretion in Entering Certain Findings of Fact and Conclusions of Law

 In issue two in both the mandamus proceeding and the interlocutory appeal, ODL first complains that the trial

court "abused its discretion in failing to modify its finding[s] of facts on the merits of ODL's claims which go beyond the question of arbitrability," also alleging that "[t]hese premature findings are improper under Texas law and ODL labors under the likelihood that ODL will never get a fair trial on the merits before [the trial court]." ODL also complains that certain of the findings are "completely unsupported by the evidence." ODL raises both of these complaints to the following findings: number 12 ("Because of a default by Conar, on December 14, 2006 CVCA orally agreed to begin paying Conar's subcontractors directly, subject to paperwork."), number 13 ("CVCA did make some payments to Conar directly."), number 15 ("ODL's services benefitted CVCA."), and number 16 ("On December 14, 2006, [Conoco] did not orally agree to begin paying Conar's subcontractors directly.").

Although it includes this challenge under issue two in its brief in the interlocutory appeal, ODL asks this Court to review the complained-of findings of fact under our mandamus jurisdiction, citing *In re H2O Plumbing*.[8] *See* 115 S.W.3d 79, 81–82 (Tex.App.-San Antonio 2003, orig. proceeding) (holding (1) that mandamus would issue to require trial judge to vacate entry of findings of fact on merits of claims, in case in which trial judge had also entered interlocutory order granting application to compel arbitration, and (2) that no interlocutory appeal lay over entry of findings of fact relating to order compelling arbitration, which was itself unappealable); *see also H2O Plumbing, Inc. v. Capital Indus., Inc.*, No. 04–03–00136–CV, 2003 WL 21217455, at *1 (Tex.App.-San Antonio May 28, 2003, no pet.) (memo.op.) (in companion case to that discussed herein, holding that no appellate jurisdiction lay over

---

**8.** For this reason, we need not reach issue two in the interlocutory appeal.

court's entry of findings of fact relating to order compelling arbitration, which was itself unappealable).

In *In re H2O Plumbing*, the interlocutory order to which the findings of fact related was an unappealable order compelling arbitration, whereas here, one of the underlying orders to which the findings relate is reviewable by interlocutory appeal, and the other is reviewable by mandamus. Additionally, in *In re H2O Plumbing*, nothing precluded the findings from being used against the complaining party in arbitration, which was one of the reasons that the court held that no adequate remedy by appeal existed. *See In re H2O Plumbing*, 115 S.W.3d at 81. Here, in contrast, the trial judge has not compelled arbitration. Assuming without deciding that no adequate remedy by appeal exists here, we hold that the trial judge did not abuse her discretion in either way that ODL contends.

First, as previously discussed, there is some evidence, when viewed in the required light, that supports each of the complained-of findings. We thus overrule this argument under issue two in the mandamus proceeding. Second, one of the threshold issues raised by the parties' arbitration motions was whether a contract existed between Conoco and ODL that could trigger the Master Agreement. Put another way, the trial judge could reasonably have believed that she had to determine, as a preliminary matter, whether a contract between these two parties that could invoke the Master Agreement arose at the December 14 meeting. If it did not, then she could also reasonably have determined that the Master Agreement—the sole agreement between these parties containing an arbitration clause—was not triggered, meaning that no arbitration agreement existed between these two parties to be enforced. Because the complained-of

findings addressed this threshold issue at the arbitration-related hearing, it was not an abuse of discretion for the trial judge to have entered them. Moreover, after ODL voiced its opposition to the findings of fact, the trial judge entered a supplemental conclusion of law that "[t]he findings made by the court in connection with the arbitration motion are not binding on the parties except in connection with the arbitration motion and are not rulings on the merits of the case." Nothing in the record indicates that the trial judge will depart from this legal conclusion at trial or that ODL "will never get a fair trial on the merits" with the trial judge because of her complained-of findings of fact, which the judge, in effect, limited to her arbitration ruling. We thus overrule the remainder of issue two in the mandamus proceeding.

## Conclusion

In the interlocutory appeal, we affirm that portion of the order that granted Conoco's application to stay arbitration that was asserted under the TAA. In the mandamus proceeding, we deny the petition for writ of mandamus complaining of (1) that portion of the interlocutory order that denied ODL's motion to compel arbitration under the FAA and (2) the trial judge's findings of fact.

Justice JENNINGS, concurring in the judgment.